UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ELLIOT REYES,                    )      NO. EDCV 09-1908-CT
                                 )
          Plaintiff,             )      OPINION AND ORDER
                                 )
     v.                          )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of                  )
Social Security,                 )
                                 )
          Defendant.             )
_____)

     For the reasons set forth below, it is ordered that judgment be entered in favor of defendant Commissioner of Social Security ("the Commissioner") because the Commissioner's decision is supported by substantial evidence and is free from material legal error.

SUMMARY OF PROCEEDINGS

     On October 13, 2009, Elliot Reyes ("plaintiff"), filed a complaint seeking judicial review of the denial of benefits by the Commissioner pursuant to the Social Security Act ("the Act"). The parties consented to proceed before the magistrate judge. On February 26, 2010, plaintiff filed a brief in support of his complaint. On March 24, 2010, the Commissioner filed defendant's brief in opposition. On March 31, 2010,

1 | plaintiff filed a statement of his intention not to file a reply.

2 | SUMMARY OF ADMINISTRATIVE RECORD

3 | 1.   Proceedings

4 | On October 7, 2004, (TR 115, 120),[1] and November 29, 2005, (TR 126,

5 | 132), plaintiff filed applications and supplemental applications for

6 | disability insurance benefits ("DIB") and Supplemental Security Income

7 | ("SSI"), alleging disability since June 2, 2004,[2] due to diabetes, back

8 | problems, liver problems, carpal tunnel syndrome, hepetitis C, and

9 | depression. (TR 162.)  The applications were denied initially and upon

10 | reconsideration.  (TR 70-73, 74-76, 81-85).

11 | On April 2, 2007, plaintiff filed a request for a hearing before an

12 | administrative law judge ("ALJ"). (TR 87.) On August 6, 2009, plaintiff,

13 | represented by an attorney, appeared and testified before an ALJ.  (TR

14 | 30-59.) The ALJ also considered vocational expert ("VE") testimony. (TR

15 | 59-65.)

16 | On April 24, 2009, the ALJ issued a decision that plaintiff was not

17 | disabled, as defined by the Act, because, notwithstanding his

18 | impairments he remains able to perform a limited range of light work,

19 | and that he thus was not eligible for benefits.  (TR 10-23.)

20 | On May 6, 2009, plaintiff filed a request with the Social Security

21 |

22 |

23 | [1]   "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

24 |

25 | [2]   The court notes that plaintiff was incarcerated for 8 months and 20 days in 2008.  (TR 17, 34.)  Benefits would not be

26 | available to plaintiff for that time period, because the Act not provide SSI benefits to an otherwise eligible person "with

27 | respect to any month if throughout such month he is an inmate of a public institution." See 42 U.S.C. § 1382(e)(1)(A).

28 | 2

1  Appeals Council to review the ALJ's decision. (TR 4-5.) On August 28,
2  2009, the request was denied. (TR 1-3.) Accordingly, the ALJ's
3  decision stands as the final decision of the Commissioner. Plaintiff
4  subsequently sought judicial review in this court.

     2.   Summary Of The Evidence
6    The ALJ's decision is attached as an exhibit to this opinion and
7  order and materially summarizes the evidence in the case.

                        PLAINTIFF'S CONTENTIONS
9    Plaintiff essentially contends the ALJ erred in assessing the
10 medical and testimonial evidence and, therefore, in finding him capable
11 of a limited range of light work.

                        STANDARD OF REVIEW
13   Under 42 U.S.C. §405(g), this court reviews the Commissioner's
14 decision to determine if: (1) the Commissioner's findings are supported
15 by substantial evidence; and, (2) the Commissioner used proper legal
16 standards. Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).
17 Substantial evidence means "more than a mere scintilla," Richardson v.
18 Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.
19 Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).
20   When the evidence can reasonably support either affirming or
21 reversing the Commissioner's conclusion, however, the Court may not
22 substitute its judgment for that of the Commissioner. Flaten v.
23 Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir.
24 1995). The court has the authority to affirm, modify, or reverse the
25 Commissioner's decision "with or without remanding the cause for
26 rehearing." 42 U.S.C. §405(g).
27 ////
28                          3

DISCUSSION

1.   The Sequential Evaluation

A person is "disabled" for the purpose of receiving social security benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).

The Commissioner has established a five-step sequential evaluation for determining whether a person is disabled.  First, it is determined whether the person is engaged in "substantial gainful activity."  If so, benefits are denied.

Second, if the person is not so engaged, it is determined whether the person has a medically severe impairment or combination of impairments.  If the person does not have a severe impairment or combination of impairments, benefits are denied.

Third, if the person has a severe impairment, it is determined whether the impairment meets or equals one of a number of "listed impairments."  If the impairment meets or equals a "listed impairment," the person is conclusively presumed to be disabled.

Fourth, if the impairment does not meet or equal a "listed impairment," it is determined whether the impairment prevents the person from performing past relevant work.  If the person can perform past relevant work, benefits are denied.

Fifth, if the person cannot perform past relevant work, the burden shifts to the Commissioner to show that the person is able to perform other kinds of work.  The person is entitled to benefits only if the

1  person is unable to perform other work.  20 C.F.R. §§404.1520, 416.920;

2  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

3      2.   Issues

4          A.   Carpal tunnel syndrome

5      Plaintiff contends the ALJ erred in considering evidence that he

6  has carpal tunnel syndrome, because he failed to: (1) find his carpal

7  tunnel syndrome to be a "severe" impairment, and (2) include limitations

8  associated with carpal tunnel syndrome in the residual functional

9  capacity ("RFC") assessment.

10     Where, as here, the ALJ finds an impairment to be non-severe, but

11 then considers the limitations allegedly caused by that impairment at a

12 subsequent stage of the sequential analysis, any error in finding the

13 impairment non-severe is harmless.  Lewis v. Astrue, 498 F.3d 909, 911

14 (9th Cir. 2007)(any error in finding plaintiff's bursitis to be

15 non-severe was harmless where ALJ considered the limitations caused by

16 the bursitis at Step 4 of the sequential evaluation).

17     Here, because the ALJ considered the limitations allegedly caused

18 by plaintiff's diagnosis of carpal tunnel syndrome at step four of the

19 sequential evaluation (see TR 17-21), any error in finding the

20 impairment non-severe is harmless.  See Lewis v. Astrue, 398 F.3d at

21 911.  Furthermore, the ALJ's conclusion that no specific functional

22 limitations remained as a result of plaintiff's carpal tunnel syndrome

23 is based on substantial evidence of record.

24     Specifically, at step four of the sequential evaluation, the ALJ

25 noted that treating physician Jarid Gray, M.D., indicated that plaintiff

26 would require an orthopedic evaluation of his carpal tunnel syndrome

27 before the doctor would recommend surgery and, moreover, concluded that,

28

1   notwithstanding his carpal tunnel syndrome, plaintiff is able to work
2   full time. (See TR 212.) Similarly, the ALJ pointed out, consultative
3   examining physician Layfe Robert Anthony, M.D., indicated that
4   plaintiff's Phalen's and Tinel's signs[3] were negative.[4] (See TR 383.)
5       For a plaintiff to recover benefits, it is not sufficient that he
6   suffer from a medical impairment such as carpal tunnel syndrome. Key v.
7   Heckler, 754 F.2d at 1549. The evidence must establish that an
8   impairment is accompanied by a physiological or functional loss
9   establishing an inability to engage in substantial gainful activity.
10  Barker v. Sec'y of Health & Human Servs., 882 F.2d 1474, 1477-78 (9th
11  Cir. 1989)). The ALJ adopted those upper extremity limitations he found
12  to be supported by substantial evidence of record, i.e., limitations in
13  plaintiff's ability to engage in repetitive overhead activities with his
14  left arm. (See TR 16, 19, 401.) This is legally sufficient, see Bayliss
15  v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (no error when ALJ
16  takes into account those limitations for which there was record
17  support), and there is no material legal error here.

18      B.   Mental impairments

19      Plaintiff next contends the ALJ erred in discussing the medical

20

21      [3] A Phalen's test is "[a] physical test involving flexion of
22  the fully extended hand at th wrist in order to aid in the
    diagnosis of carpal tunnel syndrome.  The test is positive
23  (suggestive of carpal tunnel syndrome) when flexion of the wrist
    produces numbness in the distribution of the median nerve."
24  Taber's Cyclopedic Medical Dictionary, 1569 (19th ed., 2001).
    Tinel's sign is "[a] cutaneous tingling sensation produced by
25  pressing on or tapping the nerve trunk that has been damaged . .
    . ." Id. at 2104.
26
        [4] The court observes that plaintiff was assessed as having
27  negative Phalen's and Tinel's signs in 2003, as well. (TR 419.)

28                                  6

1 evidence of his mental impairments and in omitting from the RFC an

2 assessment opined by a state agency reviewing physician. The court

3 disagrees, and finds, based upon a review of the record as a whole, that

4 the ALJ adequately addressed plaintiff's mental functioning and included

5 in the RFC all mental functional limitations he found to be supported by

6 substantial evidence of record.

7 In any event, any error here is harmless. An impairment cannot be

8 considered disabling if, as is the case here, it can be controlled. <u>See</u>

9 20 C.F.R. § 404.1530 (a); <u>Warre v. Comm'r of Social Sec. Admin.</u>, 439

10 F.3d 1001, 1006 (9th Cir. 2006).[5] And a plaintiff must follow a

11 prescribed course of treatment if it may restore the ability to work.

12 20 C.F.R. 404.1530(a). Plaintiff has failed to do so here. Indeed, as

13 the ALJ found, plaintiff dropped out of mental health care services and

14 walked away from a treatment program in 2005, suggesting his mental

15 impairments are not as debilitating as he suggests. (TR 343-44.)

16 Moreover, plaintiff reported he did well, mentally, while he was in

17 jail, from which the ALJ inferred that plaintiff's mental impairments

18 improve with consistent treatment. (TR 20, 463.) It is the province of

19 the ALJ to draw such inferences that are reasonably supported by the

20 record. <u>See</u>, <u>e.g.</u>, <u>Bayliss v. Barnhart</u>, 427 F.3d at 1216 (holding that

21

22 _____

    [5] Nor can a mental impairment be deemed disabling when
23 drug addiction is a "contributing factor material to the
determination of disability," that is, when plaintiff would no
24 longer be disabled if plaintiff stopped using drugs or alcohol.
<u>Sousa v. Callahan</u>, 143 F.3d 1240, 1245 (9th Cir. 1998). Here,
25 plaintiff has a history of drug and alcohol addiction, and he was
less than forthcoming about his drug and alcohol use with his
26 physicians and the ALJ. (<u>E.g.</u>, TR 36-38, 365, 357.) Thus, the
record suggests drug addiction may be a contributing factor with
27 regard to plaintiff's mental impairment.

28

1 ALJ properly discounted opinion of physician regarding plaintiff's
2 mental limitations because the limitations were long-standing and did
3 not prevent plaintiff from completing high school, college, a Certified
4 Nurse's Aide training program, and from training in the military).

5       There is no material legal error here.

6             C.   Credibility

7       Plaintiff also contends the ALJ did not offer legally sufficient
8 reasons to discount his subjective statements regarding the extent of
9 his impairments and, in particular, his testimony that he suffers from
10 disabling fatigue.  (See TR 44.)  The record belies this contention.

11       In assessing a plaintiff's statements regarding the extent of his
12 limitations, the ALJ must make findings that are "sufficiently specific
13 to permit the court to conclude that the ALJ did not arbitrarily
14 discredit [plaintiff's] testimony." Tommasetti v. Astrue, 533 F.3d 1035,
15 1038 (9th Cir. 2008) (citation omitted). Absent affirmative evidence of
16 malingering, an adverse credibility finding must be based on "clear and
17 convincing reasons." Carmickle v. Comm'r of Social Sec. Admin., 533
18 F.3d 1155, 1160 (9th Cir. 2008).  Although the ALJ's interpretation of
19 plaintiff's testimony may not be the only reasonable one, if it is
20 supported by substantial evidence "it is not [the court's] role to
21 second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.
22 2001) (citation omitted).

23       The ALJ amply met these standards here.

24       The ALJ found plaintiff's allegations of disability were not
25 entirely credible for the following reasons, all of which are supported
26 by substantial evidence of record:

27  •     Plaintiff was inconsistent and not forthcoming in his testimony.

28                                    8

(TR 19-20.) As one example, plaintiff initially testified he had not worked since 2004, but then, after questioning, stated that he had been working up to five-days per week on a part-time basis. (TR 30-31.) As another example, plaintiff first testified that he had not used drugs since he was a teen (plaintiff was 49 at the time of his hearing) (TR 37-38), then he stated that he did not start to use drugs and alcohol until he was in his 20s, but only did so for a year or two (TR 40), but he told physicians that he has used PCP and other illegal drugs at times since the year 2000 (TR 357). In evaluating the credibility of a plaintiff's subjective complaints, the ALJ may use "ordinary techniques" of credibility evaluation, and plaintiff's inconsistent statements are a proper reason to decline to find plaintiff to be credible regarding his limitations. <u>Tonapetyan v. Halter</u>, 242 F.3d 11244, 1147-48 (9th Cir. 2001).

- Plaintiff's treating physician concluded plaintiff is able to work full time. (TR 21, 212.) In determining credibility, an ALJ may consider physician opinions that plaintiff can work which contradict plaintiff's assertion to the contrary. <u>Moncada v. Chater</u>, 60 F.3d 521, 524 (9th Cir. 1995).

- The treating physicians did not recommend restrictions in plaintiff's activities as one would expect to see if plaintiff were as impaired as alleged, which casts plaintiff's allegations that he is unable to work into doubt. Again, it is the province of the ALJ to draw such inferences that are, as here, reasonably supported by the record. <u>Bayliss v. Barnhart</u>, 427 F.3d at 1216.

- The treatment plaintiff has received has been routine or

conservative in nature.  Evidence of conservative medical treatment is a legally sufficient reason to discount a plaintiff's testimony regarding the severity of an impairment.  <u>Parra v. Astrue</u>, 481 F.3d 742, 750-51 (9th Cir. 2007)(citation omitted.)

- Plaintiff has not been compliant with either his physical therapy or psychotherapy. (TR 20.)  Plaintiff was discharged from physical therapy at his request and due to non-compliance (TR 301), and dropped out of mental health care services, (TR 343-44).  An ALJ may properly infer that an impairment is not as severe as alleged when a plaintiff does not seek out an aggressive treatment program or is not compliant with a prescribed course of treatment.  <u>See</u> <u>Tommasetti v. Astrue</u>, 533 F.3d at 1040 (ALJ made permissible inference that plaintiff's pain was not all-disabling given that plaintiff did not seek aggressive treatment program and responded favorably to conservative treatment).

- Plaintiff's allegations of disability are inconsistent with and not supported by the medical evidence of record. (TR 17.)  <u>See</u> <u>Rollins v. Massanari</u>, 261 F.3d 857 (though the mere fact that the objective evidence does not support the extent of plaintiff's allegations is not alone enough to reject plaintiff's testimony, "the medical evidence is still a relevant factor") (citing 20 C.F.R. § 404.1529(c)(2)).  As an example, plaintiff contends he is disabled in his upper extremities due to carpal tunnel syndrome, and yet the consultative examining physician found that plaintiff did not show objective signs of that impairment.  (<u>See</u> 383.)

The mere fact that plaintiff testified he is fatigued is insufficient to support a finding that he suffers from a level of

10

1  fatigue that would impair his ability to work. See, e.g., Bayliss v.

2  Barnhart, 427 f.3d at 1217 (ALJ need not include in the RFC alleged

3  functional limitations for which there is no record support and that

4  derive only from plaintiff's subjective complaints). The ALJ is not

5  required to credit statements that are unsupported by the record. See

6  20 C.F.R. § 404.1512 (a) (plaintiff must bring to the attention of the

7  ALJ all evidence that supports her claims).

8      There is no material legal error here.

9                         CONCLUSION

10     If the evidence can reasonably support either affirming or

11  reversing the Commissioner's conclusion, the court may not substitute

12  its judgment for that of the Commissioner. Flaten v. Secretary of

13  Health and Human Services, 44 F.3d at 1457.

14     After careful consideration of the record as a whole, the

15  magistrate judge concludes that the Commissioner's decision is supported

16  by substantial evidence and is free from material legal error.

17  Accordingly, it is ordered that judgment be entered in favor of the

18  Commissioner.

19

20  DATED: March 31, 2010

21                         _____

22                         CAROLYN TURCHIN
                           UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28                         11

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**DECISION**

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability, Disability Insurance |
| Elliot Reyes | Benefits, and Supplemental Security Income |
| (Claimant) | |
| | |
| (Wage Earner) | (Social Security Number) |

## JURISDICTION AND PROCEDURAL HISTORY

On November 14, 2005, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also protectively filed a Title XVI application for supplemental security income on November 14, 2005. In both applications, the claimant alleged disability beginning June 2, 2004. These claims were denied initially on October 19, 2006, and upon reconsideration on February 21, 2007. Thereafter, the claimant filed a written request for hearing on April 2, 2007 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). On April 6, 2009, the undersigned held a video hearing (20 CFR 404.936(c) and 416.1436(c)). The claimant appeared in San Bernardino, California, and the undersigned presided over the hearing from San Rafael, California. Lynda Berkley, B.S., an impartial vocational expert, also appeared at the hearing. The claimant is represented by William M. Kuntz, an attorney.

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through September 1, 2011. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from June 2, 2004, through the date of this decision.

**10**

See Next Page



Elliot Reyes                                          Page 2 of 14

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

**11**

See Next Page



Elliot Reyes (█████████)                                    Page 3 of 14

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1. The claimant meets the insured status requirements of the Social Security Act through September 1, 2011.**

**2. The claimant has not engaged in substantial gainful activity since June 2, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

The claimant worked after the alleged disability onset date but this work activity apparently did not rise to the level of substantial gainful activity. A review of the claimant's earnings record does not reveal any work since perhaps at least 2004 that produced income at a level commensurate with substantial gainful activity (Ex. 7D). In 2003 he earned $12,512, in 2004 he earned $9,003, in 2005 he earned $3,819, and in 2006 he earned $2,948. The claimant was unable to recall what type of work he did or when exactly he earned these wages.

**3. The claimant has the following severe impairments: insulin dependent diabetes mellitus, left shoulder impingement, hepatitis C, depressive disorder, social phobia features with paranoia, and polysubstance abuse reportedly in remission (20 CFR 404.1520(c) and 416.920(c)).**

**12**

See Next Page



Elliot Reyes (█████████)                                    Page 4 of 14

The above impairments more than minimally affect the claimant's ability to perform basic work functions.

The claimant was diagnosed with carpal tunnel syndrome while he was incarcerated in the 1980s. Randy G. Delcore, M.D., reported in January 2006 that the claimant underwent electromyography in 2004 that showed moderate bilateral carpal tunnel syndrome (Ex. 3F, p. 1). A check for carpal tunnel bilaterally in September 2006 indicated negative Tinel's and Phalen's tests (Ex. 17F, p. 4). A consultative examination in September 2006 found negative Phalen's and negative Tinel's bilaterally (Ex. 11F, p. 4). Therefore, carpal tunnel syndrome does not minimally affect the claimant's ability to perform basic work function and is therefore not a severe impairment.

The claimant alleged colon problems (Ex. 9E). A colonoscopy conducted in September 2006 revealed edema of the mucosa and no signs of active colitis or neoplasm; his disposition included unlimited activity (Ex. 22F, p. 1; *see also* Ex. 22F, pp. 7-8 & 10). Colon problems do not minimally affect the claimant's ability to perform basic work function and is therefore not a severe impairment.

The claimant did not allege obesity as a severe impairment but it is noted that he is five feet, eight inches tall, and weighs two hundred and twenty-five pounds (Ex. 3E, p. 1). While obesity does not even minimally affect the claimant's abilities to perform basic work functions, obesity was considered in assessing the residual functional capacity in this decision in accordance with Social Security Ruling 02-1p by assessing the effect obesity has upon the claimant's ability to perform routine movement and necessary physical activity within the work environment.

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).**

A major dysfunction of a joint, e.g., left shoulder impingement, to meet or medically equal listing 1.02 of the listed impairments requires evidence of a gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints. In addition, there must be evidence of an involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, **or** involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively. The medical evidence of record fails to provide such evidence.

Hepatitis C is, by itself, not a listed impairment. Chronic liver disease, as described in listing 5.05, could be caused by hepatitis C, but the evidence of record reflects only a history of hepatitis C and no present treatment for hepatitis C. In January 2005, an emergency room doctor reported that the claimant ALT and AST were both slightly high and probably chronically elevated due to hepatitis C (Ex. 4F, p. 12). The claimant reported in September 2006 that he had undergone no liver biopsies or other treatments for hepatitis C; he stated that hepatitis C did not



affect his ability to work (Ex. 11F, p. 1). The doctor noted no evidence of jaundice, liver failure, or other problems on physical examination (Ex. 11F, p. 4).

Listing 5.05, chronic liver disease, has a variety of separate parts, **one** of which must be met to meet listing 5.05. **Listing 5.05A** requires evidence of hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, demonstrated by endoscopy, x-ray, or other appropriate medically acceptable imaging, resulting in hemodynamic instability as defined in 5.00D5, and requiring hospitalization for transfusion of at least two units of blood. An individual can be considered under disability for one year following the last documented transfusion; thereafter, evaluate any residual impairment. **Or, listing 5.05B** requires evidence of ascites or hydrothorax not attributable to other causes, despite continuing treatment as prescribed, present on at least two evaluations at least sixty days apart within a consecutive six-month period. Each evaluation must be documented by: (1) paracentesis or thoracentesis; **or** (2) appropriate medically acceptable imaging or physical examination **and one** of the following: serum albumin of three grams per deciliter or less; **or** international Normalized Ratio (INR) of at least 1.5. **Or, listing 5.05C** requires evidence of spontaneous bacterial peritonitis with peritoneal fluid containing an absolute neutrophil count of at least two hundred and fifty cells per cubic millimeter. **Or, listing 5.05D** requires evidence of hepatorenal syndrome as described in 5.00D8, **with one** of the following: (1) serum creatinine elevation of at least two milligrams per deciliter; or (2) oliguria with twenty-four hour urine output less than five hundred milliliters; or (3) sodium retention with urine sodium less than ten milliequivalents per liter. **Or, listing 5.05E** requires hepatopulmonary syndrome as described in 5.00D9, **with:** (1) arterial oxygenation ($PaO_2$) on room air of: sixty millimeters of mercury or less, at test sites less than three thousand feet above sea level, **or** fifty-five millimeters of mercury or less, at test sites from three thousand to six thousand feet, **or** fifty millimeters of mercury or less, at test sites above six thousand feet; **or** (2) documentation of intrapulmonary arteriovenous shunting by contrast-enhanced echocardiography or macroaggregated albumin lung perfusion scan. The evidence of record does support a finding that the claimant's chronic liver disease meets listing 5.05.

Listing 9.08 requires diabetes mellitus with evidence of neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station, acidosis occurring at least on the average of once every two months documented by appropriate blood chemical tests (pH or pC02 or bicarbonate levels), and evidence of retinitis proliferans. The evidence of record does not contain these necessary objective findings to meet or equal listing 9.08.

Peripheral neuropathies are evaluated under listing 11.14, which may include carpal tunnel syndrome. 11.14 requires a diagnosis of a peripheral neuropathy with disorganization of motor function as described in 11.04B, in spite of prescribed treatment. 11.04B looks for significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. The evidence of record does not support a finding of meets listing 11.14.

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the

**14**

See Next Page



Elliot Reyes (██████████)                                    Page 6 of 14

"paragraph B" criteria, the mental impairments must result in at least two of the following:
marked restriction of activities of daily living; marked difficulties in maintaining social
functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated
episodes of decompensation, each of extended duration.  A marked limitation means more than
moderate but less than extreme.  Repeated episodes of decompensation, each of extended
duration, means three episodes within one year, or an average of once every four months, each
lasting for at least two weeks.

On October 16, 2006, Patricia Truhn, a State agency psychological consultant, assessed that the
claimant had the following degree of limitation in the broad areas of functioning set out in the
disability regulations for evaluating mental disorders: moderate restriction in activities of daily
living, moderate difficulties in maintaining social functioning, moderate difficulties in
maintaining concentration, persistence or pace, and no episodes of decompensation (Ex. 12F, p.
11). This assessment is adopted and given great weight for the reasons explained below.

In activities of daily living, the claimant has at most mild restriction.  As mentioned above, the
claimant has worked, off an on, at least part-time until 2007 (see Ex. 7D).  The claimant is able
to care for his personal hygiene. He is able to effectively ambulate without the use of an
assistive device (Ex. 11F, p. 4).  These activities and the evidence of record are inconsistent with
a significant restriction in activities of daily living.

In social functioning, the claimant has at most moderate difficulties. The claimant can leave
home and drive a car sometimes, and is able to ride in a car (Ex. 5E, p. 4).  The claimant's wife
reported that his impairments affect his ability to get along with others (Ex. 5E, p. 6).  He
reported giving up important social, occupational, and recreational activities due to his substance
abuse (Ex. 7F, p. 23).  He told a consultative psychological examiner that he did not like being
around other people (Ex. 8F, p. 4).  The claimant worked at fast food restaurants and has lived in
group homes, which leads to a reasonable assumption that the claimant has necessarily interacted
with others (Ex. 15F, p. 3; see also Ex. 2E).  The evidence does not support a finding of greater
than moderate difficulties in social functioning.

With regard to concentration, persistence, or pace, the claimant has no more than moderate
difficulties.  His wife reported that he watches television for most of the day, with no reported
difficulties regarding concentration or understanding of the shows he watches, but his
concentration is reportedly affected by his impairments (Ex. 5E, pp. 5 & 6).  He had been
reported as cognitively intact upon examination (e.g., Ex. 2E; Ex. 2F, pp. 1-3; Ex. 8F, p. 4).  The
evidence is lacking support for a finding of greater than moderate difficulties in regards to
concentration, persistence, or pace.

As for episodes of decompensation, the claimant has experienced no episodes of
decompensation, which have been of extended duration.  The undersigned finds no evidence of
decompensation as described in the regulations.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one
"marked" limitation and "repeated" episodes of decompensation, each of extended duration, the
"paragraph B" criteria are not satisfied.

**15**

See Next Page

EXHIBIT

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. Listing 12.04 requires evidence of a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and **one** of the following: (1) repeated episodes of decompensation, each of extended duration; **or** (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; **or** (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. The undersigned finds no objective evidence to support the listed symptoms or signs or any other listed criteria.

To meet the "paragraph C" criteria of listing 12.06, evidence is required of a complete inability to function independently outside the area of one's home. There is no evidence showing a complete inability to function independently outside the area of his home.

To meet or equal listing 12.09, behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system, the required level of severity for these disorders is met when the requirements in any one of the following are satisfied; organic mental disorders evaluated under listing 12.02; depressive syndrome evaluated under listing 12.04.; anxiety disorders evaluated under listing 12.06; personality disorders evaluated under listing 12.08; peripheral neuropathies evaluated under listing 11.14; liver damage evaluated under listing 5.05; gastritis evaluated under listing 5.00; pancreatitis evaluated under listing 5.08; and seizures evaluate under listings 11.02 or 11.03. There is no evidence to support a finding that the claimant meets listing 12.09.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. The mental residual functional capacity assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform at least light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he retains the abilities to occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant should avoid repetitive overhead activities with his left arm. He should engage in work involving simple, repetitive tasks. Finally, the claimant should not engage in work requiring teamwork, instead he should work alone.**



Elliot Reyes (███████)                                      Page 8 of 14

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment--i.e., an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified he has severe pain in his neck that radiates down to his arms. He said that he is unable to tighten his fist, become tired easily, and has hepatitis C. He denied that he has ever had any surgery on his neck or back. The claimant testified that he is unable to hold a pen for too long, he experiences pain in his left shoulder and feet. His feet, he said, swell up. The claimant stated that he has been forgetful and his memory has been a problem for him since he became a diabetic. He wrote that he is always depressed and sleeps during the day (Ex. 9E, p. 2). The claimant explained that he was imprisoned from 1983 through 1986 and was last in jail in 2008 for eight months and twenty days.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant allegations of disability are inconsistent with and not supported by the medical evidence of record. X-rays of the claimant's neck and thoracic area in September 2003 showed no significant abnormality except for minimal early disc degeneration in the mid-cervical spine (Ex. 17F, p. 4). A bone scan of the claimant's thorax and pelvis in August 2004 resulted in an impression of a normal bone scan of axial skeleton (Ex. 3F, p. 13). In June 2004, the claimant was diagnosed with an acute thoracic strain (Ex. 4F, p. 19). An MRI in September 2004 revealed minimal multilevel facet disease with minimal disc interspace narrowing at L3-4, mild annular bulging at L5-S1, no spinal stenosis, no focal disc protrusions, and no neural foraminal narrowing (Ex. 3F, p. 11). The claimant had a sonogram of his right leg in June 2005 for pain; the doctor's interpretation was a normal ultrasound evaluation of major deep right leg veins (Ex. 4F, p. 10). A cervical MRI was unremarkable except for reversal of mid-cervical lordosis (Ex.

**17**

See Next Page


EXHIBIT

3F, p. 10). A thoracic spine MRI was also "essentially unremarkable" (Ex. 3F, p. 9). Ross McNaught, M.D., assessed the claimant's left shoulder pain in October 2005 as impingement syndrome with a frozen left shoulder, no need to do carpal tunnel release; however, x-rays were within normal limits (Ex. 3F, p. 2).

Imaging studies in January 2007 resulted in an impression that there was no active cardiopulmonary diseases present (Ex. 20F, p. 13). Imaging studies in September 2008 resulted in negative chest studies (Ex. 20F, p. 33). Bilateral lower extremity venous duplex ultrasound revealed no evidence of deep venous thrombosis of the bilateral lower extremities (Ex. 20F, p. 32).

Treating nurse practitioner Brett E. Robbins saw the claimant in April 2003 and assessed him with a normal physical exam (Ex. 2F, p. 2). The claimant informed Mr. Robbins that he had hepatitis C (id.). He prescribed the claimant Lortab when he complained of low back pain in November 2002 (Ex. 2F, pp. 2 &3). Prescriptions for Lortab continued through at least June 2003 (Ex. 2F, p. 2). Mr. Robbins diagnosed the claimant with depression and anxiety in October 2004 and recommended that the claimant make an appointment with Southwest Mental Health (Ex. 2F, p. 1). The claimant had another normal physical exam in August 2005 (Ex. 2F, p. 1). Mr. Robbins reported that the claimant was a "well kept man," who walked with a normal gait, could walk heel to toe backwards, and had good muscle strength in all of his extremities (id.).

Randy G. Delcore, M.D., reported that the claimant had markedly elevated blood sugars in the nine hundreds in September 2004 (Ex. 3F, p. 4). The claimant's glucose level on September 16, 2004, was five hundred and eight milligrams per deciliter (Ex. 2F, p. 21) and also nine hundred and fifty-one milligrams per deciliter (Ex. 2F, p. 19). By January 2005, his glucose was back to within normal limits (Ex. 2F, p. 6). The claimant apparently participated in a volleyball game and community service activity that consisted of sanding and sealing a picnic table and weeding the volleyball court in August 2005 (Ex. 7F, pp. 13-14). The claimant presented to an emergency room for a headache in December 2005; he reported no neck pain or stiffness, and blood sugars generally well controlled (Ex. 4F, p. 5). Darrell L. Wilson, M.D., gave the claimant ibuprofen for his headache (id.).

In August 2004 electro-diagnostic testing revealed moderate bilateral carpal tunnel syndrome and probably radicular or stenotic pathology from C8-T1 through C3-4 (Ex. Ex. 6F, p. 2). In December 2005, Jarid Gray, M.D., partially filled out a *Workforce Functional Ability Medical Report* (Ex. 1F). He diagnosed the claimant with diabetes and bilateral carpal tunnel syndrome; however, as for the carpal tunnel, Dr. Gray recognized that he would need an orthopedic evaluation (id.). It appears that Dr. Gray assessed that the claimant had the functional abilities to work full-time but had not achieved medical or mental health stability (id.).

Layfe Robert Anthony, M.D., consultatively examined the claimant in September 2006 (Ex. 11F). Dr. Anthony reported a pain-positive straight leg raising test, abnormal movements, station, and sensation but normal reflexes, gait, and range of motion with no use of an assistive device to ambulate (Ex. 11F, p. 4). He noted that the claimant gave a history of carpal tunnel but Phalen's and Tinel's signs were negative; a decreased range of motion in the left shoulder



Elliot Reyes ████████                                    Page 10 of 14

despite full strength, and decreased sensation of the feet consistent with diabetic neuropathy (*id*.). Dr. Anthony provided no opinion or functional limitations.

In October 2006, Rox Burket, a State agency medical consultant, established the claimant's exertional limitations as lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, with no limitations for pushing and pulling (Ex. 13F, p. 2). The consultant opined that the claimant retained the ability to occasionally climb ramps, stairs, ladders, ropes, and scaffolding, and occasionally balance, stoop, kneel, crouch, and crawl, climb (Ex. 13F, p. 3). The consultant established that the claimant should avoid repetitive overhead activities on the left side due to a decreased range of motion and impingement syndrome (Ex. 13F, p. 4). B. Harris, another State agency medical consultant, affirmed the prior assessment in February 2007 (Ex. 16F).

Brent W. Turek, Ed.D., consultatively examined the claimant on September 25, 2006 (Ex. 8F). Dr. Turek's tentative diagnoses included recurrent, moderate major depressive disorder, alcohol dependence in sustained remission, poly-drug dependence in sustained remission, and social phobia with features of paranoia on axis one, with a global assessment of functioning (GAF) of 45 (Ex. 8F, p. 5).

On October 16, 2006, Patricia Truhn, a State agency psychological consultant, assessed that the claimant had medically determinable mental impairments that did not precisely satisfy the diagnostic criteria for listings 12.04, 12.06, and 12.09 (Ex. 12F, pp. 1, 4, 6 & 9). She assessed that the claimant was moderately limited in the abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek, and to travel in unfamiliar places or use public transportation (Ex. 15F, pp. 1-2). The consultant opined that there was no evidence to suggest the claimant was unable to work around others or to support his allegations of severe social phobia considering he was working at a fast food restaurant at least twenty hours per week and lived in a homeless shelter (Ex. 15F, p. 3). R. Tashjian, M.D., affirmed the October 2006 psychological assessment in February 2007 (Ex. 16F, p. 2).

The claimant's wife, Michelle Reyes, indicated that the claimant engages in some cleaning but that his complains about pain for most of the day (Ex. 5E, pp. 1 & 2). She must remind him to take his medications (Ex. 5E, p. 3). A Social Security Administration field office employee, during a face-to-face interview with the claimant, observed that the claimant had no problems reading, understanding, concentrating, sitting, standing, walking, using his hands, writing, and seemed coherent (Ex. 2E, p. 4).

The evidence cited above supports the residual functional capacity assessed in this decision. The medical signs, laboratory findings, and longitudinal medical history, do not support a finding of disability as defined in the Social Security Act and regulations. Additionally, the claimant has not been entirely forthcoming or consistent.

The claimant was consistently inconsistent. Although the claimant initially testified that he had not worked since June 2, 2004, he recalled after questioning that he had been working,

**19**

See Next Page

EXHIBIT



sometimes five days per week on a part-time basis.  He testified that he is not an "alcohol user" but drinks a sixteen ounce beer when the Lakers are playing.  He presented to Mr. Robbins in August 2005 for a physical before entering into Southwest Center's Drug and Alcohol Treatment program as he was drinking a lot of hard liquor every day (Ex. 2F, p. 1).  Furthermore, the claimant testified that he has not used PCP since he was seventeen years old.  Yet he reported in August 2005 that he last used PCP in 2000, when he was about forty-four years old (Ex. 7F, p. 23).  He reported to a consultative examiner in September 2006 that he stopped using angel dust and other drugs twenty-three years prior, when he was twenty-seven years old (Ex. 8F, p. 2).  Finally, a report dated April 21, 2008, notes that the claimant "appeared to have anxiety due to PCP use" (Ex. 19F, p. 39).  However, it is not clear if this report is regarding then present PCP use or is an opinion based on the long history of PCP use reported by the claimant (id.).

Although the claimant has received treatment for the allegedly disabling impairment, that treatment has been essentially routine or conservative in nature.  Randy G. Delcore, M.D., noted in August 2004 that the claimant was taking Bufferin for pain, was in physical therapy, and would probably return to work (Ex. 3F, pp. 7-8).  In September 2004, Dr. Delcore recommended resuming physical therapy for one month with a back exercise program; he expected to release the claimant afterwards "to work without orthopaedic restriction" (Ex. 3F, p. 4).  And then in October 2004, the claimant told Dr. Delcore that the back pain was getting better and requested that he continue physical therapy.  On the other hand, there is evidence that the claimant has not been entirely compliant with physical therapy or psychotherapy, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application.  The claimant was discharged from physical therapy at his request and due to non-compliance in the plan of care when the claimant did not return for treatments (Ex. 5F, p. 5).  He dropped out of mental health services at Southwest Center Behavioral Health Services (Ex. 7F, p. 9).  He "walked away from the program" at Horizon House in September 2005, and became "rather defensive and stated there was a misunderstanding regarding the rules of the treatment program" (Ex. 7F, p. 10).  The claimant reported he was doing well while in jail (Ex. 19F, p. 30), which supports a conclusion that with consistent treatment, the claimant can do better.

Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor.  Yet a review of the record in this case reveals no restrictions recommended by treating doctors.  The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision.  The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of 'not disabled.'  Although those

**20**





physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision).

As for the opinion evidence, great weight is accorded Dr. Gray's opinion that that the claimant had the functional abilities to work full-time; this opinion is supported by the medical record (Ex. 1F). Significant weight is accorded to the State agency medical and psychological consultants' opinions as they were all well supported from the record and consistent with the record as a whole. The one exception is the psychological consultant's assessment that the claimant's inability to work around others was unsupported. The claimant has been generally consistent regarding the inability to get along with others, and is supported by his wife's report and Dr. Turek's consultative examination. The claimant's history of incarceration and drug use lends greater credibility to a finding that the claimant is limited to working on a team or on a job that requires greater than frequent interaction with others.

In sum, the above residual functional capacity assessment's exertional, postural, and manipulative limitations are supported by the claimant's left shoulder impingement with some consideration to his obesity. The remainder of the residual functional capacity is supported by the claimant's and his spouse's reports of social limitations supported by consultative examiner Dr. Turek's tentative diagnoses.

**6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a sorter, fork lift operator, janitor, packager and shipper, and a counter. Lynda Berkley, an impartial vocational expert, testified that the claimant's past relevant work was exertionally light to medium work with specific vocational preparation (SVP) codes between two and five according to the *Dictionary of Occupational Titles* (DOT). The residual functional capacity assessed in this decision limits the claimant to less than a full range of unskilled, light work. Accordingly, the claimant is unable to perform past relevant work.

**7.   The claimant was born on July 1, 1956 and was forty-seven years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age. (20 CFR 404.1563 and 416.963).**

**8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**21**



Elliot Reyes █████████                                          Page 13 of 14

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations (SSRs 83-12 and 83-14). If the claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18 and Rule 202.11. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative exertionally light and unskilled occupations such as mail clerk, DOT number 209.687-026, and a garment sorter, DOT number 222.687-014. Ms. Berkley testified these occupations are categorized by the *Dictionary of Occupational Titles* as having SVP codes of two. There are, testified Ms. Berkley, 20,000 mail clerk positions in San Bernardino County and 150,000 positions nationally; 1,200 garment sorter positions in San Bernardino County and 65,000 nationally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from June 2, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

**22**

See Next Page



Elliot Reyes                                     Page 14 of 14

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on November 14, 2005, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on November 14, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Thomas P. Tielens*
_____
Thomas P. Tielens
Administrative Law Judge

April 24, 2009
_____
Date

**23**

